[Civ. No. 634. Third Appellate District.—April 6, 1910.]

## T. M. BURNS, Respondent, v. FRANK J. CASEY, Appellant.

STREET IMPROVEMENT—DECREE FORECLOSING LIEN—APPEAL—ABSENCE OF EVIDENCE—UNTENABLE OBJECTIONS TO DESCRIPTION IN RESOLUTION—AFFIRMANCE.—Upon appeal from a decree foreclosing the lien of a street assessment upon plaintiff's property for a street improvement under the Vrooman act, taken without a bill of exceptions or the evidence in any form, it is held that the objections of appellant to the insufficiency of the description of the work in the resolution of intention are without substantial merit, and that the judgment must be affirmed.

ID.—GENERAL RULE AS TO SPECIAL PROCEEDINGS IN INVITUM—STRICT CONSTRUCTION—STREET PROCEEDINGS—PRACTICAL ABSURDITY NOT REQUIRED.—Although, as a general rule, special proceedings for the assessment and taxation of property for special purposes are *in invitum,* and must be strictly followed, yet the laws authorizing assessments for street improvements and other improvements necessary to the welfare of the community are not supposed to be so strictly construed as to render them practically nonsensical and nugatory.

ID.—SUBSTANTIAL COMPLIANCE WITH STREET LAW—PROPER NOTICE.—A substantial compliance with the provisions of the street law ought to be all that should be required, where property owners have been given such notice, in form required by law, of the proposed im-

provement as will put them in possession of fairly accurate knowledge of the character and extent of the work to be done, and of a reasonable approximation of the detailed and total cost of the improvement.

ID.—FAILURE TO OBSERVE IMMATERIAL TECHNICAL REQUIREMENTS—ASSESSMENT NOT INVALIDATED.—In such case, no assessment ought to be nullified, and the contractor forced to suffer a heavy loss, or perhaps made a bankrupt, merely because of the omission of the authorities to observe some immaterial technical requirements of the law authorizing the work.

ID.—FOUNDATION FOR CURBS, GUTTERS, ETC.—SPECIFICATIONS—"TAMPING EARTH"—DISCRETION OF SUPERINTENDENT—"SELECTED EARTH"—"CRUSHED ROCK."—A specification that the foundation for the curbs, gutters and round corners shall be laid by "tamping the earth" upon which they are to rest is clear and definite; but a discretion in the superintendent of streets to determine, as the result of digging, whether "selected earth material" or "crushed rock" shall be necessary is reasonable, and cannot invalidate the assessment.

ID.—ABSENCE OF EVIDENCE UPON APPEAL—DIFFERENCE IN COST NOT SHOWN.—There being no evidence upon appeal as to the difference in the cost of obtaining "selected earth material" and "crushed rock," and such difference being a question of fact according to the circumstances under which either is obtainable, there is no basis upon which the judgment can be reversed on account of the discretion vested in the street superintendent.

ID.—QUESTION NOT PREDETERMINABLE BY CITY COUNCIL.—The question whether the earth in which the foundations of the gutters, curbs and round corners are to be laid was naturally of sufficient compactness and strength to be suitable for that purpose, or whether "selected earth material" or "crushed rock" would be required, could not be determined by an inspection of the surface, and was not therefore subject to predetermination by the city council.

ID.—EVEN SURFACE OF STREET—USE OF "SUITABLE" EARTH MATERIAL.—A specification requiring the contractor to bring the surface of the street to a smooth and even grade by the use of "suitable" earth material is not subject to just criticism by the use of the word "suitable." If that word were omitted, it would be implied in the obligation imposed upon the contractor, and it is not made less certain by inserting that word.

ID.—ALTERNATIVES IN MACADAM AND CONCRETE—MATERIALS FOR CRUSHED ROCK—QUESTION OF FACT—DIFFERENCE IN COST.—There being nothing in the record to show any difference in the cost between the materials of cobbles, trap and basalt, out of which the macadam and concrete may be constructed, this court cannot take judicial notice of any difference in the cost of such materials, the only difference being a question of fact as to which might be more

readily accessible or procurable than the others in sufficient quantity to do the work.

Id.—Location of Concrete Catch-basin—Determination by City Surveyor—Cost not Affected.—The fact that the location of a concrete catch-basin to be constructed by the contractor was to be determined by the city surveyor is not material, where the construction of the catch-basin is minutely described, and it does not appear that its location at any particular point would increase or diminish the cost of its construction.

Id.—Lines and Location of Curbs and Gutters not Specified—Matter of Common Knowledge.—The fact that the lines and locations of the curbs and gutters are not specified does not render them uncertain. It is matter of common knowledge that curbs must be placed at one of the edges of a street, and that they form the inner side of a gutter.

Id.—Discretion of Contractor as to Method of Mixing Cement—Use of Hand or Machine.—Where the standard of concrete is the same, the discretion given to the contractor to construct it by hand or by machine simply gives him discretion as to the method of laying the concrete of that standard.

Id.—Invalid Power Conferred upon City Surveyor—Power of Adjudication Unexercised or Attempted.—The judicial power conferred upon the city surveyor to make a final adjudication of any misunderstanding or dispute as to the interpretation of the contract is invalid and void; but it is harmless where there was no attempt at the exercise of such power and no occasion arose calling for its exercise.

Id.—Validity of Discretion Conferred.—The validity or invalidity of power or discretion conferred upon the county surveyor or the superintendent of public streets depends upon its nature. The giving of discretion to some person as to matters of detail in construction is inevitable in every street improvement, if no power is improperly delegated.

APPEAL from a judgment of the Superior Court of Sacramento County.   C. N. Post, Judge.

The facts are stated in the opinion of the court.

A. L. Shinn, C. G. Shinn, and Carl L. Shinn, for Appellant.

White, Miller & McLaughlin, for Respondent.

HART, J.—This is a suit for the foreclosure of a lien arising upon an assessment of the property of the appellant,

situated in the city of Sacramento, for the improvement of the street upon which said property abuts.

A decree foreclosing said lien and authorizing the sale of said property for the satisfaction of the said assessment, costs, etc., was entered, and this appeal is brought here by the defendant, Casey, from the judgment, unaccompanied either by a bill of exceptions or the evidence in any form.

The legality of the assessment is challenged upon the alleged ground that the board of trustees of the city of Sacramento never acquired jurisdiction to order the work to be done. This contention is founded upon an alleged insufficient description in the resolution of intention of the proposed improvement—that is, that with regard to the description of the work to be done, there were material defects in the specifications, which were made a part of the resolution of intention.

Section 3 of the so-called "Vrooman street law" (Stats. 1905, p. 64) provides: "Before ordering any work done or improvement made which is authorized by section 2 of this act, the city council shall pass a resolution of intention so to do and *describing the work.*"

The following are the alleged fatal defects in the specifications upon which we are asked to render a judgment invalidating the assessment:

1. "Curbs, gutters and round corners are to be constructed of concrete in accordance with plans attached, and in the following manner: A proper foundation shall be prepared by thoroughly tamping the earth upon which they are to rest, and if necessary, in soft or yielding ground, crushed rock or selected earth material shall be deposited upon the foundation and thoroughly compacted."

2. "The street shall be brought to a smooth and even surface conforming to the required cross-section of the subgrade by excavating all places above grade and filling the depression with suitable earth material."

3. "The crushed rock shall be of the harder quality of cobbles, basalt or trap, free from loam, clay or shale."

4. "The rock used in concrete must be of the harder quality of cobbles, basalt or trap, free from loam, clay or shale or other inferior material."

5. "A concrete catch-basin not exceeding five (5) feet in depth will be constructed at a point to be designated by the city surveyor."

6. "If the mixing is done by hand, the sand and cement must be carefully measured and thoroughly mixed while dry upon a tight platform, after which sufficient water applied in a spray will be added during subsequent mixing to convert it into a uniform stiff mortar. Then to the required amount of broken rock evenly spread upon a platform and thoroughly drenched with water, the mortar shall be added and the whole mass turned over at least three (3) times with shovels when every piece of rock shall be completely coated with mortar.

"If a machine is used for mixing, it must be of a standard and approved type and the concrete so mixed shall be at least equivalent to that mixed by hand as above described."

The general objection to all those parts of the specifications complained of here is that they are so indefinite and uncertain in certain particulars that they necessarily vest in the superintendent of streets an inordinate and unwarranted amount of discretion as to the character or nature of certain materials with which the street was to be improved, as well as to the manner in which portions of the work were to be done.

It is just as well in the beginning to declare it to be our judgment that not a single one of the objections to the assessment urged here possesses substantial merit.

It is, of course, well settled and well understood that proceedings leading to the assessment and taxation of property for special purposes, as contradistinguished from those general burdens necessarily imposed alike upon all property for the support of state and municipal governments, are *in invitum*, and, in order to validate a tax imposed for special purposes, the law authorizing such proceedings must be strictly followed. But the laws authorizing assessments for special purposes—for the improvement of streets, building of sidewalks and sewers and other like improvements necessary to the comfort and welfare of inhabitants of local communities —are not supposed to be so "strictly" construed as to render them, practically, nonsensical and nugatory. A substantial compliance with their provisions ought to be all that should be required, by which we are to be understood as meaning that,

where property owners and bidders for the work have been given such notice, in form required by law, of the proposed improvement as will put them in possession of fairly accurate knowledge of the character and extent of the work to be done and of a reasonable approximation of the detailed and total cost of the improvement, and the work has been well performed, then in that case no assessment ought to be nullified and the contractor thus forced to suffer a heavy loss, or perhaps made a bankrupt, merely because of the omission by the authorities to observe some immaterial technical requirements of the law by whose provisions alone the work is authorized.

The specific criticism involved in the first objection here is that there is delegated by the board of trustees to the superintendent of streets the power of determining what should constitute a "proper foundation" for the curb, gutters and round corners, and further, that that official is also invested with the discretion of deciding whether there should be used in the preparation of said foundation "crushed rock" or "selected earth material." The contention is that the street superintendent was thus given power, by the exercise of which he was able to increase or diminish the cost of the work at his will.

We do not so read that portion of the specifications objected to. It is first therein specifically provided how and in what manner such foundation should be prepared in order to constitute it the "proper foundation" contemplated and provided for by said portion of the specifications. As seen, the language is: "A proper foundation shall be prepared *by tamping the earth upon which they* (curbs, gutters and round corners) *are to rest,*" etc., and thus far the description of the work to be performed is about as definite and specific as language could make it. What clearer terms in the English language could be employed to prescribe to the contractor the absolute duty of so tamping and thus hardening the earth as to make the foundation stable and durable? And that is all that that part of the specifications called for, and we do not see that it could have called for either less or more. As to the second point under the first objection, that to the street superintendent unauthorized power, fatal to the assessment, was delegated by committing to his judgment or volition the determination whether, according as he found the condition

of the earth, "crushed rock" or "selected earth material" should be used in the preparation of the foundation, one answer is, and we think it is conclusive, that, the evidence not having been brought up, there is no showing here that there was any material difference in the cost between the two kinds of materials from which the superintendent was authorized to exercise a selection. Besides, we think that, in any event, it was not only a reasonable, but a necessary, discretion to vest in the street superintendent. To determine whether the ground or earth upon which the foundation was to be laid was "soft or yielding," required investigation, as by digging into the soil a sufficient depth to ascertain whether it was naturally "soft or yielding," thus requiring crushed rock, or selected earth material, according as to the degree or extent of that quality it possessed, or whether it was naturally sufficiently compact in itself to require neither crushed rock nor selected earth material.

In *McCaleb* v. *Dreyfus,* 156 Cal. 204, [103 Pac. 924]—the latest expression of the supreme court involving an interpretation of the provisions of our street law—it is said:

"In awarding a contract for street work it is quite apparent, since the surface of the ground is exposed, that there may be an accurate predetermination of the amount and character of material to be used. It is unnecessary, therefore, to delegate any discretion in this matter to the street superintendent. Such was the condition in *Perine etc. Co.* v. *City of Pasadena,* 116 Cal. 6, [47 Pac. 777], (a street work case), where the specifications required that 'the contractor shall put in such extra concrete as the superintendent of streets and the city engineer may require, and in such places and in such form as they may designate.' It was easily susceptible of predetermination upon the part of the council whether any extra concrete was required at all, and, if so, the quantity and the place of use. This delegation, therefore, was held to be unreasonable. But where, as here, the work is the construction of a sewer, involving, first the digging of the trench, and, second, the placing of the sewer upon a durable foundation, it is apparent that but one of three courses can be pursued in the letting of the contract." The court then proceeds to point out three different methods by which a contract for the building of a sewer may be let, and showing that

the better course for the owners of property affected by the assessment is that objected to in that case, where the challenged specifications read: "If, *in the judgment* of the city engineer, it shall be necessary to form any portion of said foundation [of the sewer] of concrete, said concrete shall be paid for as extra work at the price per cubic yard mentioned in the contract." The court further said in that case, and it is equally true as to the objection we are considering here: "Indisputably, the determination as to whether or not a concrete foundation would be necessary must be vested in some one. Indisputably, also, the proper person to determine this was not the contractor, but the street superintendent or city engineer."

As stated, and as is plainly obvious, the question whether the earth upon and in which the foundation for the gutters, curbs and round corners was to be laid was naturally of sufficient compactness and strength to be suitable for that purpose was not one which could, upon a mere inspection of the surface, be determined, and was not, therefore, subject to predetermination by the city council.

There is a wide distinction between the case here and the case of *Bolton* v. *Gilleran,* 105 Cal. 250, [45 Am. St. Rep. 33, 38 Pac. 881]. In the latter case the contract *expressly* vested in the street superintendent the power of authorizing, for the construction of a "five-foot brick sewer," payment at the rate of either $9.83 per lineal foot or $12.78 per lineal foot, according as that official might determine what the nature of the foundation should be. Readily it is thus to be noticed that the governing board in that case conferred upon the superintendent of streets discretionary power which enabled him to exercise his own volition with regard to the cost of the improvement. Manifestly, the board exceeded its authority when so delegating to the street superintendent such power, and the assessment was, of course, held to be void by reason thereof. In the case here there is absolutely nothing in the specifications which, in express terms, authorizes the street superintendent to either increase or decrease the price for laying the foundation for the curbs, gutters, etc., nor, as we have before stated, is there anything on the face of the contract itself dealing with gutters, curbs, etc., from which it can be said that the preparation of the foundation would cost

more by the use of crushed rock for that purpose than by the use of "selected earth material," or *vice versa*. Whether there would be any material difference between the cost of one and that of the other would largely depend, it seems to us, upon conditions existing with respect to the accessibility of either the one or other of these materials. It is safe to say that it is known, as an abstract proposition within the scope of common knowledge, that crushed rock would be much more expensive than ordinary earth material for use in the preparation of a foundation for curbs, etc. But by the phrase "selected earth material" we understand is meant that that quality of earth must be used which would as well serve the purposes of a foundation as would crushed rock, and the difficulty in the way of a predetermination of the difference in the cost between the two materials, if any, would be the expense, first, incident to discovering and selecting the earth material which would meet the test under that description, then the price to be paid for it, if it had to be purchased, and, furthermore, if the points at which such material was procurable were remotely situated from the point at which it was to be used for the foundation, what would be the expense of transporting it to said last-mentioned point.

In *Lambert* v. *Marcuse*, 137 Cal. 47, [69 Pac. 620], where the specifications called for the construction of a stone and grouted gutters from rock of either of two classes, as classified by the ordinance authorizing the work, designated as "class A" and "class B," and where the claim was that thus an unwarranted discretion was vested in the street superintendent to use the rock of either class, it is said: "The option was given to the contractor to use either class A or class B rock. The material to be used was macadamizing rock, and the difference between the two classes was not in the material, but in the density, or hardness, of the rock. But whether there was any difference in the cost does not appear, and we cannot say, as a matter of law, that there was any such difference. The difference in the cost may, by reason of the situation of the rock in place, or the cost of quarrying of the two kinds, be practically equalized, so that it would become a matter of indifference to everybody concerned which class was used."

The foregoing language has peculiar application to the portion of the specifications now under review, for, as we have tried to show, if, abstractly, it may be said that crushed rock is more expensive than selected earth material, the use of the latter might, for reasons which we have suggested, and perhaps others which have not occurred to us, be as expensive and therefore cost as much as crushed rock, and thus the difference in the expense of the two materials at least approximately equalized so that there would be no material difference in the cost between the two. At any rate, we cannot say, as a matter of law or as a matter of fact, in the absence of an affirmative showing that there was any material difference between the cost of crushed rock and that of "selected earth material," that any such difference existed or would exist.

The objection that the provision requiring that the street shall be brought to a smooth and even surface by " . . . excavating the places above grade and filling the depressions with *suitable earth material*" is mortally uncertain, is too hypercritical to merit extended notice. The vice of that portion of the specifications, it is said, is in the use of the language we have italicized, and it is contended that thereby the street superintendent is given such unauthorized and dangerous power as to enable him to cause the cost to exceed that provided for by the resolution. A provision that the depressions should be filled with "earth material" would probably have attracted no comment or excited no criticism by appellant, as it would have been sufficient to describe the material to be used with substantial and satisfactory accuracy. Under such a description it certainly could not be said that anything less than *suitable* earth material was intended to be used. We are, therefore, unable to discern how or in what way the provision is made any less certain by the addition of the word "suitable."

What we have said with regard to the objection first considered applies with equal pertinency and force to the third and fourth points stated in the order in which we have here presented them. We cannot take judicial notice of the fact, if it be a fact, that there is any difference in the cost of the three several kinds of material out of which the crushed rock for the macadam and the rock used in concrete were to be formed. In fact, it would seem that there could in fact be

no material difference in the cost between cobbles, trap and basalt, except possibly in the fact that the one might be the more readily accessible or procurable than the others in a sufficient quantity to do the work.

In the case of *Lambert* v. *Cummings*, 2 Cal. App. 643, [84 Pac. 266], cited by appellant, the specifications for macadamizing and guttering certain streets in the town of Berkeley prescribed that the macadam should be formed out of one of three classes of rock, of which two classes only (classes A and B) were described with sufficient clearness and definiteness to convey approximately precise information as to the character of the material to be used in the work. The resolution, however, provided that the rock designated as class C should be such rock as might be approved by the board of trustees upon a sample presented to said board for that purpose. Under such a provision it was within the power of the board to require the macadam to be made out of any kind of rock submitted for its inspection and approval, whether it was rock coming within class A or B, which classes, as seen, were defined and described in the specifications, or an entirely different character of rock from that of either class A or class B. The court in that case well said: "It is at once evident that a contractor bidding for the work must have done so upon the probability of being compelled to use the most expensive rock for macadamizing unless he had been assured in some way by some private arrangement that he might use other or different rock. The board were thus enabled to favor one contractor and discriminate against another. . . . A resolution of intention, followed by a notice of letting a contract to macadamize a certain street with such rock as may be approved by the board of trustees, does not describe the work to be done. The contractor may be required to use marble or soft sandstone or cobbles."

It will be observed that the power vested in the board in the cited case by the language of that provision of the specifications designating "class C" made the descriptions of classes A and B, otherwise clear and definite, equally as indefinite and uncertain as class C itself.

But, as seen, the specifications here specifically describe the rock from which the macadam and the concrete should be made, and do not, as in the case cited, leave to the governing

board the right to finally determine whether either of the
kinds of rock described should be used or, disregarding alto-
gether the rock described, that some other and different kind
of rock, of which there was no description whatever in the
specifications, may be used.

In *Lambert* v. *Marcuse,* 137 Cal. 47, [69 Pac. 620], where,
as seen, the street superintendent was clothed with the power
to select, in the construction of gutters, from two classes of
rock, the supreme court, affirming the judgment for plaintiff
in an action to foreclose the assessment, says: ''The contract
gave the superintendent no power to change the material,
nor did it give him any discretion to require material not
provided for in the contract and in the specifications.'' So
it is true here. Some discretion in street or sewer or like
work must be left to the street superintendent or officer to
whom is committed the superintendence of such work, or else
all improvements contemplated by the street law must be at
an end, and where it does not appear as a matter of law or of
fact, as it does not appear here, that the exercise of such
discretion will result in either materially increasing or de-
creasing the cost of the proposed improvement beyond or
below that contemplated by the contract, a judgment in-
validating the assessment because of the delegation of such
discretion would not only be inequitable and unjust, but un-
conscionable.

The cases of *Perine Cont. etc. Co.* v. *Pasadena,* 116 Cal. 6,
[47 Pac. 777], *Fay* v. *Reed,* 128 Cal. 360, [60 Pac. 927], *Bay
Rock Co.* v. *Bell,* 133 Cal. 150, [65 Pac. 299], *McDonnell* v.
*Gillion,* 134 Cal. 332, [66 Pac. 314], and *Williamson* v. *Joyce,*
137 Cal. 107, [69 Pac. 854], are cited by appellant in support
of the alleged invalidity of the assessment because of the
objections now under discussion; but an examination of these
cases will disclose an obvious distinction, as to the facts, be-
tween them and the case at bar. It is unnecessary to give
them special attention in this opinion. It is enough to say
that in those cases there was vested, by reason of an insuffi-
cient and indefinite description of the work to be done, in the
officer charged with the immediate direction or superintend-
ence of the work a discretion by the exercise of which the
cost of the improvement could have been increased or di-
minished at his will. As stated, such is not the case here.

The fifth objection challenges the validity of the specifications upon the ground that they fail to definitely fix the point at which "a concrete catch-basin" should be located, the exact point of location of said basin being left to the judgment of the city surveyor. In this connection, appellant points out that the specifications do not provide for the location of the curbs, gutters and gutter drains, and contends that for this reason also the specifications are fatally defective. In support of these objections we are referred to the case of *Grant* v. *Barber,* 135 Cal. 188, [67 Pac. 127]. There the specifications, which were, as here, made part of the resolution of intention, provided that the contractor "shall put in such culverts as the street superintendent may direct," there being no description of such culverts, either as to size or the material from which they should be constructed. Such discretion or power thus delegated to the street superintendent was out of all reason, and the act of the governing board in delegating it manifestly *ultra vires,* or beyond their authority.

In the case at bar the catch-basin and curbs, gutters and gutter drains are minutely described, both with regard to size and the character of the materials of which they were to be made, and, as to the catch-basin, it is to be said that the power given the street superintendent merely to determine the particular point at which it should be located on the street was perhaps only that power which it was found necessary that he should exercise in order to properly locate it. In any event, it does not appear here (and we do not see how it could be made so to appear) that the location of the basin at any particular point would increase or diminish its cost over or below that which would be involved in its location at some other point. As stated, the size and the material from which it was to be made were specified, and, obviously, its cost readily ascertainable therefrom. As to the claim that the specifications are uncertain in that the line of the curbs, gutters, etc., is not specifically located or pointed out, the reply is that there was no necessity for specifically describing so obvious a proposition. Common knowledge tells us that curbs must be placed at one of the edges of the street, and thus, as the Century Dictionary tells us, they form the inner side of a gutter. As counsel for respondent well suggest in their brief: "The edges of the street being established by official surveys,

it is impossible to understand how any doubt could arise as to the location of the curbs, and the position of the curbs being thus fixed, the plans, as a part of the resolution, fix the position of the gutter and the gutter drains.'' In other words, the exact location of the curbs, gutters and gutter drains, as contemplated by the specifications here, is as easily ascertainable from said specifications as if the same were specifically described, or as would be the location of the foundation of a building with reference to the superstructure.

The remaining objection to be considered involves that part of the specifications providing for the character of the concrete to be used, and the contention is that the street superintendent is therein given the discretion to decide which of two methods may be adopted for the purpose of mixing the sand and cement to be used in forming the concrete. This contention cannot be sustained. All that the specifications call for in this respect is a certain standard of concrete, and they expressly provide that such must be the standard, whether the mixing is done by hand or by a machine. While, under the terms of the specifications, the contractor was at liberty to mix the sand and cement either by hand or by means of a machine, there is no language to be found therein which authorized the street superintendent to dictate to the contractor the adoption of either method. The evident purpose of this part of the specifications was to secure concrete of a certain approved standard, regardless of the means to which the contractor might deem it the better plan to resort in order to furnish the kind of concrete required.

There is a further objection raised against the assessment based on that provision of the specifications which reads: ''In case of a misunderstanding or dispute as to the meaning or intent of any provision of these specifications, the interpretation of the city surveyor shall be final.''

While it is the paramount duty of the street superintendent, or the city surveyor, or any officer who may be legally charged with the responsibility of superintending the work, to require the work to be done in accordance with the terms of the contract or the specifications, the street law does not provide nor does it contemplate that such power as is thus sought to be delegated should be exercised by an officer or agent of the city or the property owners, and if it did so

provide, the act to that extent would no doubt be held to be in violation of the constitution. There is a wide distinction between the power of one selected as an arbitrator to pass upon the proposition whether the work has been done according to the specifications and the power sought to be conferred here by which the decision of the city surveyor as to disputes involving the ''meaning or intent'' of the specifications is made final and conclusive, thus opening the way for adjudications which do not constitute that ''due process of law'' by which citizens can alone be deprived of life, liberty or property. But we are unable to perceive how the provision could have misled bidders for the work. And, assuming that the city surveyor could, by the exercise of the power, have increased or diminished the cost of the work above or below that indicated by the resolution, there is nothing here to show that any attempt was made upon his part to exercise such power, or that occasion arose calling for its exercise.

Thus we have reviewed all the objections urged against the validity of the assessment involved in this action.

It is our opinion, as already expressly stated, and as must be manifest from the views generally we have expressed herein, that all the objections to the assessment in this case involve technicalities behind which there is little if any substance. It is proper, and indeed necessary, that all the provisions and requirements of laws authorizing the levy of assessments or taxes upon the property of citizens, particularly for special purposes, should be strictly followed, where a strict observance thereof is reasonably practicable; for, unless the rights of property owners are not completely safeguarded in the matter of the levy of such taxes, it may become an easy matter to perpetrate all sorts of fraud against property owners, even to depriving them of their property without lawful right or due process of law. Yet, as the supreme court says in *Chase* v. *Trout*, 146 Cal. 365, [80 Pac. 81], ''however desirable it would be to have the precise details of the work, even to the smallest fraction, fixed in advance of the bids, so that the exact cost to the contractor, as well as the contract price may be known at the time the contract is let, it always has been and always will be impossible to do so.'' And in *Haughawout* v. *Hubbard*, 131 Cal. 678, [63 Pac. 1079], similar language is used. It is there said: ''To some

extent such details must depend on unanticipated contingencies of the actual construction. The specifications must, therefore, always fail, more or less, in certainty or completeness of detail, and hence the most accurate and detailed specification must leave unprovided for many questions arising in the course of the work as to the kind and amount of work or materials and other details of construction. The giving of discretion to some person as to all these details, the culverts possibly excepted, is inevitable in every such work. If not vested in and exercised by the street superintendent, it will be exercised by the contractor himself. The statute recognizes this condition, and itself provides that the work must be done to the satisfaction of the street superintendent.'' To the same effect is *Haughawout* v. *Raymond,* 148 Cal. 312, [83 Pac. 53].

That there may be no misapprehension of our views regarding certain propositions treated in this opinion, we desire to say that we are not to be understood from anything herein said as holding that cases have not arisen or that cases may not arise in which the invalidity of a street or like assessment has appeared or may appear from the very terms of the resolution of intention itself. In other words, we are not holding here that, if the resolution of intention should disclose the delegation to the street superintendent of power which the legislature clearly intended should be exercised alone by the board itself, or which, from its very nature, could be said to clothe the superintendent with discretion to enlarge or diminish the cost of the work at his will, the assessment would not have to be declared invalid, regardless of whether or not there was an affirmative showing of actual injury as the result of the exercise of such power. But where, as here, the power or discretion delegated does not appear upon its face to be material or unauthorized, this court cannot declare, as a matter of law, or in the absence of evidence showing that positive injury has in fact resulted from its exercise, that, with regard to the matters as to which such discretion is delegated, the discretion or power so delegated is material or beyond the contemplation of the law.

No substantial reason appears to us why the judgment should not stand, and the same is, therefore, affirmed.

Burnett, J., and Chipman, P. J., concurred.